**PHILLIPS PETROLEUM COMPANY,**
Plaintiff,

v.

**David L. LADD, Commissioner of Patents, Defendant.**

**Civ. A. No. 2096–61.**

United States District Court
District of Columbia.
July 25, 1963.

Paul L. Gomory, J. A. Young, L. M. Oberlin, Washington, D. C., Sidney Neuman, Donald A. Peterson, Chicago, Ill., for plaintiff.

Clarence W. Moore, Solicitor, Washington, D. C., for defendant.

JACKSON, District Judge.

This is an action brought pursuant to 35 U.S.C. § 145, praying this Court to adjudge that plaintiff is entitled to receive a patent defined by two claims which were rejected by the Board of Appeals of the United States Patent Office.

The applicants are David R. Smith, and Robert P. Zelinski, employees of plaintiff at the time of their invention. The application, Serial No. 578,166, filed April 16, 1956, entitled "Process and Catalyst for Production of Rubbery Polymers" was assigned to plaintiff.

All of the 15 process claims were allowed, and the issue here relates to product claims 17 and 19, reading as follows:

"17. A rubbery polymer of 1,3-butadiene characterized by at least 85 per cent *cis* 1,4-addition."

"19. A rubbery polymer of 1,3-butadiene in which the polymer is formed and characterized by cis 1,4-addition, trans 1,4-addition and 1,2-addition of the butadiene, at least 85 per cent of the polymer being formed and characterized by cis 1,4-addition."

The primary Examiner rejected the involved claims over either of the Greene or Binder references, and also as unduly broad in that it disclosed as a minimum at least 85% cis 1,4.

The Board of Appeals in its decision affirmed the rejections of the Examiner. However, it did not sustain the objection on the breadth of the claims for the reason that, in its opinion, the disclosure amply supported the claim for cis 1,4 additions above 85% as a critical low element.

The references relied upon are as follows:

Greene Patent No. 2,762,790
Dated: September 11, 1956
Application dated: December 26, 1952
An article by John L. Binder
Entitled: "Microstructures of Polybutadienes and Butadiene-Styrene Copolymers"
Vol. No. 46 — Industrial and Engineering Chemistry
Pages — 1727–1730 (August 1954)

The Greene patent, all claims of which are for process, is entitled "Polymerization of Aliphatic Conjugated Diolefins". One of its objectives is "to provide a new and practical process for the polymerization of aliphatic conjugated diolefins, particularly 1,3 butadiene, and certain derivatives thereof, to high molecular weight, solid, elastic polymers characterized by the presence of a predominant proportion of 1,4-linked, cis-configurational monomer

368

units." Both tribunals of the Patent Office held the involved claims to be unpatentable over that patent as being different in degree rather than in kind.

Dr. Binder, author of the second reference, in the acknowledgment paragraph at the end of the article, notes that his description of the work therein was part of the "Government synthetic rubber program". From that article seemingly little was known about the molecular structure of the matters with which the article was concerned. Contained in the conclusion is the statement that "the results of the analysis reported here show that while the amount of cis 1,4 addition increases with increasing temperature of polymerization, a polybutadiene containing 100% cis 1,4, or trans 1,4 addition cannot be made at any practical temperature".

Both the tribunals of the Patent Office have held that the expression "100% cis" is such a disclosure as to render the claims herein unpatentable.

It was brought out at the trial that at the beginning of World War II there was a great shortage of natural rubber in the United States, and its principal source of that material was unavailable. At that time natural rubber had been almost universally used in automobile and truck tires, as well as in many other products. Consequently, that condition triggered the efforts of our most experienced and skilled scientists and technologists to produce a product that would approach as nearly as possible the properties of natural rubber.

It appears clearly from the evidence here that the product defined by the involved claims is new, and possesses vastly superior characteristics to any known synthetic rubbers, and that it conformed to the desired characteristics discussed hereinbefore.

■ There are two issues for decision: (1) Did the Board of Appeals correctly decide that the polymer defined in the involved claims is not different in kind over that which could be produced in the prior art, but merely differs in degree, and (2) was it correctly decided by the Board that the radically different and improved properties and characteristics accomplished in the polymer of plaintiff were foreseeable?

During the trial several witnesses highly skilled in the technology and chemistry of the art appeared on behalf of plaintiff, and many paper and physical exhibits were received in evidence.

It appears that technologists, under expert supervision, attempted to produce the product contained in Example 1 of the Greene patent. That is the only example·in which the cis appears. From the specification there appears to be no indication as to how the process of Example 1 might be performed. However, from the evidence it is indicated that technologists for plaintiff attempted, to the best of their ability, to pursue what they deemed to be the proper process for producing the material which the specification sets out. After repeated experiments it was shown that the product resulting therefrom was a soft, sticky, semi-solid, impractical substance, utterly unfit for use in heavy duty truck tires.

At the trial it appeared that the test material of the Greene patent was compounded in a standard tire tread recipe, and the test results were compared with those of the involved polymer. The results demonstrated a showing of very poor material resulting from the Greene process, and, furthermore, in the testimony with respect to the tests, it was stated that such material possessed scarcely any rubber characteristics, and was not an acceptable synthetic rubber.

It seems clear to the Court from the evidence at the trial that Dr. Binder's article was a report concerned with an analyses of the molecular structure of a great number of synthetic rubbers, and that the article was principally devoted to relating the structures and conditions under which the polymers were made. In analyzing the article, Dr. Reynolds, an experienced, skilled research chemist in the art, testified in behalf of plaintiff that the highest cis content of any of the polymers shown in the article was

34.6%, and that such content showed only a slight increase as the polymerization grew higher.

Technicians and researchers of plaintiff experimented to determine whether that trend continued. It was a difficult and dangerous experiment, but the result of their work appeared in the report in evidence, and that report indicated that the correlating temperature cis content trend does not continue, but is reversed at 120° centigrade.

■ When, by reason of a combination of properties and characteristics, a new product constitutes a substantial improvement, providing unforeseen uses and results, the product represents a difference in kind and not merely in result. Shell Development Co. v. Watson, D.C., 148 F.Supp. 373; General Tire & Rubber Co. v. Watson, D.C., 184 F.Supp. 344. As distinguished from difference in degree, difference in kind exists when a product possesses a unique combination of extraordinary and novel properties and characteristics of which the prior art was not aware. Becket v. Coe, 69 App.D.C. 51, 98 F.2d 332, Torok v. Watson, D.C., 122 F.Supp. 788.

■ The Court finds that new and unexpected properties of a truly unique nature resulted from the presence of at least 85% of the cis 1,4 configuration, and the Court, as well as the Board of Appeals considers that percentage to be critical. There can be no doubt as to the nature of that difference, for prior to Smith et al. no one had described a polybutadiene having more than 50% of the cis 1,4 configuration. Where criticality is present, there must be a difference in kind, and the Court finds that such a distinction exists here.

From all of the evidence produced on the part of plaintiff, in the Court's opinion, it has been convincingly shown that plaintiff's "cis 1,4" synthetic rubber is nearly equivalent to natural rubber in low hysteresis, and is far superior to natural rubber in resistance to abrasion. It is also superior to natural rubber in its resilience, or "bounce". The product, likewise, compares most favorably with natural rubber in resistance to aging, freezing, and cracking tendency.

With respect to the so-called disclosure in the Binder patent, the position of counsel for defendant is that since 100% cis is mentioned, it is such a disclosure as would deny patentability to the claims herein. Based upon the evidence, and a thorough analysis of Binder, it seems clear to the Court that defendant's contention amounts to nothing more than a vague negative hypothesis.

With respect to products, distinguishing them from mere names, the involved polymers are defined by critical limitations, were not predictable, differed in kind from the prior art products, had not been made, and probably could not have been attained, until the present inventors made their discovery.

Counsel for the defendant relied principally upon the case of In re Von Bramer, 127 F.2d 149, 29 CCPA 1018. In the opinion of the Court the Von Bramer case differs in its facts from the instant case. In that case, as maintained by counsel for plaintiff, the prior art disclosure was what is known as the "Geneva" name of a chemical compound defining molecular structure. The properties claimed in the Von Bramer case differed only in degree from those admittedly disclosed in the prior art. As far as the predictable properties of the Von Bramer case is concerned, they were found in any similar compound, and those compounds were capable of synthesis by recognized classical organic reactions.

Furthermore, in that case there were statements in a number of prior art references that the compound relied upon as anticipatory had been made and used, and that the five carbon atom alkyl limitation in that case contradicted the statement of the invention in the specification as an arbitrary and meaningless distinction from the prior art.

In the instant case, as brought out by counsel for plaintiff, polymers, as a class,

**370**

are *sui generis,* and there is no Geneva name that fixes the structure in molecular weight. Polymers in the instant case differ in kind from the properties of polybutadienes of the prior art, and likewise, have properties which are unpredictable in light of the prior art. Those polymers had not been made by any method of synthesis by skilled workers in the art, including Dr. Binder who made that admission in the reference, although many highly skilled scientists in the art had been working on these projects.

Dr. Binder stated that he knew of no way to make 100% cis 1,4 polybutadiene at any practical temperature, and there is a lack of any prior art statement that any such cis polybutadiene had ever been made, and furthermore, plaintiff has established 85% cis as a critical lower limitation which the Court deems to constitute a meaningful distinction.

The Court distinguishes between products and mere names. In Application of LeGrice, 301 F.2d 929 (1962), the Court of Customs and Patent Appeals said:

"* * * the description of the invention in the printed publication must be an 'enabling' description. Our study of the prior cases which have imposed this interpretation on the clause indicates that the proper test of a description in a publication as a bar to a patent as the clause is used in section 102(b) requires a determination of *whether one skilled in the art to which the invention pertains could take the description of the invention in the printed publication and combine it with his own knowledge of the particular art and from this combination be put in possession of the invention on which a patent is sought. Unless this condition prevails, the description in the printed publication is inadequate as a statutory bar to patentability under section 102(b)."* (Emphasis original).

■ A mere naked formula for a chemical compound which teaches the art nothing about the product which it may represent, and does not put anyone in possession of the invention, is not the type of statement that should be relied upon for anticipation. See In re Papesch, Cust. & Pat.App., 315 F.2d 381; Foremost Dairies, Inc. v. Watson, D.C., 132 F.Supp. 736; Mathieson Alkali Works, Inc. v. Coe, 69 App.D.C. 210, 99 F.2d 443; Cohn v. United States, 93 U.S. 366, 23 L.Ed. 907, and Rem-Cru Titanium, Inc. v. Watson, D.C., 147 F.Supp. 915.

In the opinion of the Court the evidence adduced at the trial on behalf of plaintiff, together with a careful examination of the briefs of the parties, demonstrates clear error on the part of the decision of the Board of Appeals.

In light of the foregoing discussion, the Court concludes that plaintiff is entitled to a patent on claims 17 and 19 of application Serial No. 578,166, and the defendant, Commissioner of Patents, shall be authorized to issue a patent in conformity therewith.

What has been stated hereinbefore shall constitute Findings of Fact and Conclusions of Law.